# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| PHOTOMEDEX, INC., | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 07-0025 |
| | : | |
| ST. PAUL FIRE & MARINE INS. CO., | : | |
| Defendant. | : | |
| | : | |

## Memorandum and Order

YOHN, J.                                                    February ____, 2008

PhotoMedex, Inc., an insured, brings this action alleging breach of contract and asking for

a declaratory judgment under 28 U.S.C. § 2201 against insurer St. Paul Fire & Marine Insurance

Co. ("St. Paul").  The parties have filed cross-motions for summary judgment asking the court to

resolve St. Paul's obligations under the insurance policy to defend and indemnify PhotoMedex

against a malicious prosecution lawsuit.  The primary issue before the court is whether

Pennsylvania or California law applies to the insurance contract.  For the reasons discussed

below, I conclude a conflict exists between Pennsylvania's and California's relevant laws and

Pennsylvania law applies to this contract dispute.  Under Pennsylvania law, the court will grant

PhotoMedex and deny St. Paul summary judgment on the issue of St. Paul's duty to indemnify

PhotoMedex under the insurance policy.  Furthermore, St. Paul cannot recoup its payment of the

settlement of the malicious prosecution lawsuit from PhotoMedex.  On the issue of defense costs,

the court will grant partial summary judgment to PhotoMedex, concluding that Pennsylvania law

controls, but deny summary judgment as to the final amount of attorney fees and costs that St.

Paul owes PhotoMedex for defense of the malicious prosecution action.

## I.     FACTUAL BACKGROUND

This suit arises from a dispute regarding insurance coverage for the defense and

indemnification of a malicious prosecution action in California.  PhotoMedex is a Delaware

corporation with its principal place of business in Montgomeryville, Pennsylvania, but with other

locations throughout the United States, including Carlsbad, California.  (Pl. Statement of

Undisputed Facts ¶ 1 ("Pl. Facts"); Def. Statement of Undisputed Facts ¶¶ 1, 2 ("Def. Facts");

McGrath Decl. ¶ 2, Aug. 16, 2007.)  St. Paul is an insurer with its headquarters in St. Paul,

Minnesota and underwriting operations in numerous states, including Pennsylvania.  (Pl. Facts

¶ 2; Def. Resp. to Pl. Facts ¶ 2.)

In 2003, PhotoMedex purchased an insurance policy from St. Paul (policy number

TE06401644) (the "policy") covering the period from April 15, 2003 through April 15, 2004.

(Pl. Facts ¶ 3; Def. Facts ¶ 3; *see* Pl. Mot. Summ. J. Ex. A ("Policy") 1.)  The policy was written

by St. Paul in "plain, easy-to-understand English."  (Policy 1.)  PhotoMedex obtained the policy

through the Philadelphia-based insurance agent and broker Aon Risk Services, Inc. ("Aon").  (Pl.

Mot. Summ. J. Ex. C, McEwen Dep. 40:21-43:13, June 26, 2007.)  Aon representatives Christine

Whirlow and Tim Gosnear managed the PhotoMedex account at Aon's Philadelphia office.  (*Id.*

at 28:8-29:24.)

St. Paul account executive Maureen McEwen and her assistant Pui Chu Yu, a senior

underwriting support specialist, developed a quote for the policy in St. Paul's Blue Bell,

Pennsylvania office.  (*Id.* at 9:8-22, 27:2-13, 30:6-22, 36:2-37:4.)  To assess PhotoMedex's risk

profile for the quote, McEwen and Yu communicated with PhotoMedex representatives directly

and through Aon's employees Whirlow and Gosnear.  (*Id.* at 28:8-31:8, 67:3-69:20.)  They later

met with PhotoMedex officials, including its corporate counsel Davis Woodward, in

PhotoMedex's Montgomeryville offices.  (*Id.* at 31:12-33:3, 81:11-82:7.)  After PhotoMedex

agreed to the quote, Whirlow then advised McEwen by e-mail that coverage was bound.  (*Id.* at

71:23-73:2.)  McEwen and Yu prepared and issued the binder, which McEwen signed in Blue

Bell on April 17, 2003.  (*Id.* at 82:8-85:14.)  McEwen sent the binder to Aon representatives in

Philadelphia, who forwarded it to PhotoMedex in Montgomeryville.  (*Id.* at 24:22-26:22, 49:9-

22.)

    McEwen and Yu similarly prepared the final policy in St. Paul's Blue Bell office.  (*Id.* at

36:21-37:4.)  The policy named "PhotoMedex, INC." as the insured and identified "147

KEYSTONE DRIVE, MONTGOMERYVILLE, PA 18936" as PhotoMedex's address.  (Policy

1.)  The policy also listed the insurer as "St. Paul Fire and Marine Insurance Company," located

in St. Paul, Minnesota.  (*Id.*)  Under the line "Our authorized representative is:"  the policy

named "AON RISK SERVICES INC OF PA" at "ONE LIBERTY PLACE, 1650 MARKET

STREET STE 100, PHILADELPHIA PA 19103."  (*Id.*)

    Among other coverage types, the policy provided commercial general liability coverage

("CGL") to PhotoMedex in a section labeled "Technology Medical and Biotechnology

Commercial General Liability."  (Policy, Tech. Med. & Biotech Commercial Gen. Liab.

Prot.—Claims-Made ("CGL") 4.)  The CGL coverage included "personal injury liability," which

provided:  "We'll pay amounts any protected person is legally required to pay as damages for

covered personal injury that:  results from your business activities; and is caused by a personal injury offense committed while this agreement is in effect."  (*Id.*)  The definition of a person injury offense included "[m]alicious prosecution."  (*Id.* at 4.)  The policy also stated:  "We'll also have the right to settle any claim for suit within . . . the available limits of coverage."  (*Id.* at 5.)  Under the policy, St. Paul had the duty to defend against "a claim or suit for injury or damage covered by the agreement . . . even if all of the allegations of the claim or suit are groundless, false, or fraudulent."  (*Id.*)  At the time of issue, McEwen understood the policy to cover any malicious prosecution lawsuit against PhotoMedex, regardless of where PhotoMedex incurred the liability.  (McEwen Dep. 62:8-63:9, 129:3-13.)

The CGL section contained a subsection entitled "Where This Agreement Covers," which stated that the "coverage territory" included "the United States of America, including its territories and possessions; Puerto Rico; Canada; and international waters or air space only during travel or transportation between any of the above places."[1]  (Policy, CGL 8-9.)  The general rules, which "apply to the entire policy unless you're notified otherwise," stated:  "We make changes in our standard insurance policy forms from time to time.  These changes must conform to state law and are filed with insurance supervisory authorities for approval."  (Policy, General Rules 2.)  The general rules also provided that "[a]ny part of this policy that conflicts with state law is automatically changed to conform to the law."  (*Id.* at 3.)

The policy was subject to state-specific endorsements that conformed the insurance contract to the requirements of state law.  St. Paul added these endorsements for those states in

---

[1] A separate portion of the insurance policy lists the Carlsbad, California location as the "#1" insured location.  That portion of the policy, however, is not implicated in the current dispute.

which PhotoMedex had facilities and those states that required automotive endorsements. (McEwen Dep. 53:1-56:4.)  St. Paul included a "California Required Endorsement" (the "California endorsement").  The endorsement stated that "[t]his endorsement changes your policy to comply with California law." (Policy, California Required Endorsement 1.)  The California endorsement covered a variety of topics not a issue in this case and concluded:  "All other terms of your policy remain the same." (*Id.* at 3.)  The endorsement did not mention either California law preventing indemnification for wilful misconduct, *see* Cal. Ins. Code § 533, or any limitation on attorney fees and costs if a conflict of interest between insured and insurer arises, *see* Cal. Civ. Code § 2860(c).[2]

PhotoMedex paid the premiums for the policy through a financing arrangement with Cananwill, Inc., an Aon subsidiary located in Philadelphia, by sending the monthly premium checks from its Montgomeryville office.  (McEwen Dep. 50:1-52:20.)  Cananwill/Aon received the premium payments on behalf of St. Paul and then forward them to St. Paul's Minnesota headquarters.  (*Id.*)

---

[2] The "Georgia Required Endorsement" disclaims:

Intentional Acts.  The following applies to any agreement included that's part of your policy.
    1.  The following is added to the Exclusions – Losses We Won't Cover, or similarly titled, section:
We won't pay for loss or damage caused by any act committed:
    •    by or at the direction of any protected person; and
    •    with the intent to cause a loss.

(Policy, Georgia Required Endorsement 2.)

5

On November 4, 2004, Dean Irwin and RA Medical Systems, Inc. ("RA Medical") sued PhotoMedex and its employee Jeffrey Levatter[3] for malicious prosecution in the San Diego Superior Court of the State of California.  (Pl. Facts ¶ 5; Def. Facts ¶ 6; Def. Mot. Summ. J. Ex. B.)[4]  PhotoMedex tendered this action to St. Paul for defense and indemnity.  (Pl. Facts ¶ 45; Def. Resp. to Pl. Facts ¶ 45.)

St. Paul investigated the malicious prosecution suit and sent PhotoMedex a letter on January 31, 2007, advising that St. Paul agreed to provide a defense under a full reservation of rights.  (Pl. Mot. Summ. J. Ex. D, Letter from Pam Matsufuji to Dave Woodward, Jan. 31, 2007.)  The correspondence advised that St. Paul would provide defense counsel or that, under the rules imposed by California Civil Code § 2860(c), PhotoMedex was entitled to reimbursement for representation it selected at the rate of $175 for counsel and $100 for paralegals, the rate St. Paul purported to actually pay attorneys in the ordinary course of business for defense of similar

---

[3] There is no dispute that Levatter is a "protected person" covered under the policy. (Policy, CGL 3.)

[4] PhotoMedex had sued RA Medical and Irwin on April 29, 2003 for breach of contract, misappropriation of trade secrets, intentional interference with contract relations, unfair competition, and conversion.  (Def. Facts ¶ 6; Pl. Resp. to Def. Facts ¶ 6; Def. Mot. Summ. J. Ex. C.)  PhotoMedex and St. Paul dispute whether PhotoMedex prepared the lawsuit against RA Medical and Irwin in Pennsylvania or California.  Evidence demonstrates that PhotoMedex's materials for the RA Medical action "have always been kept in Pennsylvania, under the control of PhotoMedex's corporate counsel."  (McGrath Decl. 2.)  PhotoMedex's corporate counsel planned, and its Board of Directors approved, the lawsuit in Pennsylvania.  (*Id.*)

The complaint "was jointly prepared by California counsel [Robert Young and Michael Matthias] and by PhotoMedex's corporate counsel and executive officers."  (*Id.*)  PhotoMedex's California counsel prosecuted the underlying action against Irwin and RA Medical.  (Def. Mot. Summ. J. Ex. G, Young Dep., March 22, 2007; Def. Mot. Summ. J. Ex. F, Matthias Dep., March 23, 2007.)  In preparation for the lawsuit, both Young and Matthias went to PhotoMedex's facility in Carlsbad and were assisted by its California employees Levatter and Tim Eberhardt. (Young Dep. 42:19-49:2, 101:13-102:19; Matthias Dep. 72:16-73:9.)

6

actions in San Diego County.  (*Id.* at 8-9.)  St. Paul also notified PhotoMedex that under

California Insurance Code § 533 it was not required to indemnify PhotoMedex with regard to the

malicious prosecution action.  (*Id.* at 6-7.)

PhotoMedex responded that under Pennsylvania law St. Paul was required to pay

reasonable attorney fees and expenses, including those of the counsel it selected.  (Pl. Mot.

Summ. J. Ex. D, Letter from Marianne Bechtle to Pamela Matsufuji, Mar. 9, 2007.)  PhotoMedex

notified St. Paul that it had retained its own counsel, choosing David L. Schrader and Christina

Stein of the Los Angeles office of Morgan, Lewis, and Bockius, LLP, with hourly rates of $685

and $360, respectively.  (*Id.* at 2.)

In early 2007, the parties to the malicious prosecution action discussed settlement.  (Pl.

Mot. Summ. J. Ex. D, Letter from Davis Woodward to Pamela Matsufuji 1-2, Apr. 9, 2007.)

PhotoMedex notified St. Paul of the settlement discussions, updated St. Paul on defense strategy,

and sought St. Paul's participation in settlement, which was potentially within the disputed

indemnity coverage limits.  (*Id.*)  On May 16, 2007, St. Paul sent a letter to PhotoMedex

discussing a settlement meeting on May 11, 2007 and subsequent negotiations between RA

Medical, Dean Irwin, PhotoMedex, and St. Paul.  (Def. Reply Br. Ex. A, Letter from Eric A.

Fitzgerald to Richard McMenamin 1-2, May 16, 2007).  St. Paul offered "to provide such funds

as are needed to settle this case at the settlement conference scheduled for Thursday, May 17,

2007, while reserving its right to seek reimbursement from PhotoMedex of all amounts in excess

of $250,000."[5]  (*Id.* at 2; *see also* Pl. Mot. Summ. J. Ex. D, Letter from Eric A. Fitzgerald to

---

[5] For reasons not disclosed in the record, St. Paul agreed to pay $250,000 to settle the
malicious prosecution suit but reserved its right to recover from plaintiff any amounts in excess
of $250,000 that it paid in order to settle the action.  However, St. Paul representatives attended

Richard McMenamin 1-2, May 3, 2007.)  St. Paul notified PhotoMedex that it would proceed to

settle for $1,500,000 with that reservation unless PhotoMedex chose "to take over responsibility

for defending this lawsuit and for paying any resulting settlement or judgment."  (Def. Reply Br.

Ex. A, Letter from Eric A. Fitzgerald to Richard McMenamin 1-2, May 16, 2007.)  PhotoMedex

responded on May 17, 2007, objecting that St. Paul's reservation of rights was contrary to the

policy and that it would consider St. Paul's payment to settle the action to be voluntary.  (Def.

Reply Br. Ex. C., Letter from Richard F. McMenamin to Eric A. Fitzgerald, May 17, 2007.)

PhotoMedex emphasized that Pennsylvania law applied to the contract and that St. Paul was

obligated to fully indemnify and defend PhotoMedex.  (*Id.* at 3.)

On May 17, 2007, the Honorable Joan M. Lewis, the presiding judge in the malicious

prosecution litigation, held a settlement conference with all relevant parties, including both

PhotoMedex and St. Paul.  (Pl. Mot. Summ. J. Ex. E, Rep.'s Tr. Settlement Conf. 6:17-25)  Pam

Matsufuji represented St. Paul and was authorized to settle on its behalf.  (*Id.* 12:28-13:3.)  Judge

Lewis did not object to St. Paul's role in the settlement.  The parties agreed to settle the

malicious prosecution action for $1,200,000 in exchange for dismissal of all claims with

prejudice.  (*Id.* 8; Pl. Facts ¶ 53; Def. Facts ¶ 8.)

The Confidential Settlement Agreement and Mutual Release (the "settlement agreement")

terminated the malicious prosecution claims against PhotoMedex.  (Pl. Mot. Summ. J. Ex. F 1-

2.)  The agreement stated that "it shall not be construed as an admission of any liability or the

---

the settlement conference and agreed to pay $1,050,000 on behalf of PhotoMedex under the
policy.  (Pl. Mot. Summ. J. Ex. E, Rep.'s Tr. Settlement Conf. 9:26-11:6.)  The confidential
settlement agreement and mutual release was shared with and approved by St. Paul
representatives.  (*Id.* at 12:28-13:3.)

truth or the correctness of any allegation of claim against [PhotoMedex], or of fault or liability by

[PhotoMedex]."  (*Id.* ¶ 6; *see also id.* ¶ 7 ("The language of this Settlement Agreement shall not

be presumptively construed either in favor of or against any of the Parties.").)  Pursuant to the

agreement, the malicious prosecution case was dismissed with prejudice, and St. Paul paid RA

Medical $1,050,000.[6]  (Pl. Facts ¶ 62; Def. Resp. to Pl. Facts ¶ 62.)

With regard to attorney fees and costs associated with PhotoMedex's defense of the

malicious prosecution action, PhotoMedex submitted invoices totaling $914,466.70 for expenses

incurred prior to the settlement.  St. Paul seeks to avoid payment of a substantial portion of these

expenses, and has not paid any amount to date.


## II.     PROCEDURAL BACKGROUND

PhotoMedex filed a complaint against St. Paul in this court on January 3, 2007 and an

amended complaint on February 1, 2007.  The amended complaint seeks compensatory and other

damages from St. Paul for breach of contract that occurred when (1) St. Paul refused to pay

PhotoMedex's counsel more than the hourly rate of $175 to defend the malicious prosecution

action, and (2) St. Paul repudiated its obligation to indemnify PhotoMedex in that action.

PhotoMedex also asks the court for a declaratory judgment defining the legal rights of the parties

under the insurance contract, particularly (1) that Pennsylvania, not California, law is applicable

to construction of the policy; (2) that St. Paul is obligated to pay PhotoMedex's defense fees and

costs without limitation; (3) that St. Paul owes PhotoMedex a duty to indemnify PhotoMedex for

---

[6] Plaintiff's prior law firm, Jenkins & Gilchrist LLP, a co-defendant in the malicious
prosecution action, agreed to pay $150,000.  (*Id.* ¶ 8.)

the malicious prosecution action; and (4) that St. Paul is obligated to pay for attorney fees and expenses associated with the present action.

St. Paul filed its answer with affirmative defenses on February 23, 2007.  On July 2, 2007, this court granted defendant's motion to file a counterclaim, and St. Paul filed its counterclaim on July 6, 2007.  In its counterclaim, St. Paul asks the court to enter declaratory judgment that St. Paul is not obligated to indemnify to PhotoMedex and that St. Paul is entitled to reimbursement of $800,000 of the $1,050,000 it paid in settlement, plus interest, and to award St. Paul costs and fees.  PhotoMedex replied to the counterclaim on July 26, 2007.

After discovery, the parties filed cross-motions for summary judgment.  PhotoMedex asks this court hold that (1) St. Paul must reimburse PhotoMedex for the full amount of the attorneys' fees and costs totaling $914,466.70; and (2) St. Paul was obligated to indemnify PhotoMedex and, in any case, St. Paul is not entitled to recoup its voluntary settlement payment.  (*See* Pl. Proposed Order.)   St. Paul, to the contrary, asks this court to hold that (1) California law controls the fee rate in must pay for defense of PhotoMedex; and (2) St. Paul is not obligated to indemnify PhotoMedex, so PhotoMedex must reimburse $800,000, the portion of the settlement with respect to which St. Paul reserved its rights.  (*See* Def. Proposed Order 1.)

The court must resolve two disputes arising under the policy.  First, did St. Paul have a duty to indemnify PhotoMedex for the malicious prosecution action under the personal liability section of the policy?  Second, did St. Paul have a duty to pay attorney fee rates greater than the amount it actually pays to attorneys in the ordinary course of business in the defense of similar actions?  At the heart of both of these disputes is whether Pennsylvania or California substantive law governs the insurance contract.

### III.    CHOICE OF LAW

St. Paul argues that California law applies to the instant insurance policy, barring indemnification of the settlement of that case and limiting the attorney fee rates it is required to pay in defense notwithstanding any contrary language in the policy.  PhotoMedex counters that Pennsylvania law applies to the insurance contract, requiring the court to enforce the contract as written.  To resolve the present motions for summary judgment, I must first decide which state's substantive law applies to the coverage dispute.  Pennsylvania's choice of law rules govern the question of which state's substantive law the court will apply in this diversity action.  *See Klaxon Co. v. Stenton Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941) (holding that a federal court exercising its diversity jurisdiction must apply the choice of law rules of the forum state).

The Pennsylvania Supreme Court has adopted a "flexible rule" for choice of law questions, "which permits analysis of the policies and interests underlying the particular issue before the court."  *Griffith v. United Airlines, Inc.*, 203 A.2d 796, 805 (Pa. 1964); *see also, e.g.*, *Budtel Assocs., LP v. Cont'l Cas. Co.*, 915 A.2d 640 (Pa. Super. Ct. 2006).  This approach "gives to the place having the most interest in the problem paramount control over the legal issues arising out of a particular factual context and thereby allows the forum to apply the policy of the jurisdiction most intimately concerned with the outcome of the particular litigation."  *Griffith*, 203 A.2d at 805 (internal quotation marks and alterations omitted).  The *Griffith* "interest/contacts" approach applies to insurance contract disputes.  *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 227-28 (3d Cir. 2007).[7]

---

[7] *Hammersmith* clarified the Third Circuit's handling of Pennsylvania's choice of law standard for insurance contracts, which previously focused on the place of execution.  *See* 480 F.3d at 227.

Under this approach, the court first considers whether an actual conflict exists between the substantive laws of the involved states. *Id.* at 229-30. If an actual conflict exists, the court then classifies the conflict as either true, where application of either forum's law would impair the other forum's policy, or false, where only one forum's policy would be impaired by application of the other's law. *Id.* at 230. If there is a false conflict, the court applies the law of the forum whose interests would be impaired. If there is a true conflict, the court proceeds to a contacts and governmental interests analysis, ultimately applying the substantive law of the state with the most substantial qualitative relationship to the disputed insurance contract. *Id.* at 230-31. In this case, the court concludes Pennsylvania law controls its interpretation of the policy because a true conflict exists between Pennsylvania and California's relevant laws and, although both states have substantial interests in application of their laws, Pennsylvania's contacts, weighed in light of its interests, relate directly to the interpretation of the policy whereas California's contacts relate less relevantly to the underlying tort.

### A.    Identifying the Conflict

Under the *Hammersmith* approach of the Third Circuit, the "first part of the choice of law inquiry is best understood as determining if there is an actual or real conflict between the potentially applicable laws." 480 F.3d at 230 (citing *Air Prod. & Chem., Inc. v. Eaton Metal Prod. Co.*, 272 F. Supp. 2d 482, 490 n.9 (E.D. Pa. 2003)); *see also Huber v. Taylor*, 469 F.3d 67, 74 (3d Cir. 2006) ("Before a choice of law question arises, there must first be a true conflict between the potentially applicable bodies of law."). The parties have identified two sets of applicable California and Pennsylvania laws that potentially conflict. The first concerns indemnification of malicious prosecution lawsuits. The second concerns the fee rates for defense

12

of insured actions by independent counsel.  As discussed below, the court concludes that actual

conflicts exist between both sets of laws.

### 1.      Indemnification of Malicious Prosecution Lawsuits

An actual conflict exists between California's and Pennsylvania's laws regarding

indemnity of malicious prosecution actions.  California Insurance Code § 533, entitled "Wilful

act of insured," provides in relevant part that:  "An insurer is not liable for a loss caused by the

wilful act of the insured."  In *Downey Venture v. LMI Insurance Co.*, 78 Cal. Rptr. 2d 142 (Cal.

Ct. App. 1998), the California Court of Appeal applied section 533's preclusion to bar an

insurer's contractual duty to indemnify an insured for the "wilful act" of malicious prosecution.

The insurance contract at issue in *Downey* expressly required the insurer to indemnify and defend

malicious prosecution actions, and the insurance company agreed to do so, but reserved its rights

for reimbursement under California law.  *Id.* at 146-47.  Before trial, the insurance company

settled the underlying malicious prosecution lawsuits at the behest of the insured.  *Id.* at 147-48.

The court, despite the express language of the insurance policy, held:

> [T]he public policy precluding indemnification coverage for "wilful acts," as
> expressed in section 533, bars indemnification for any malicious prosecution claim
> for which an insured is personally liable in California, even though such coverage
> was expressly promised in the policy.

*Id.* at 146, 166.  The *Downey* court concluded that section 533 "is an implied exclusionary clause

which, by statute, must be read into all insurance policies."  *Id.* at 154 (citing *J. C. Penney Cas.*

*Ins. Co. v. M.K.*, 804 P.2d 689, 693 (Cal. 1991)).  Thus, under California law, "the parties to an

insurance policy cannot contract for such coverage," and the insurer is not bound to indemnify

personal injury resulting from malicious prosecution actions ostensibly covered by an insurance policy.  *Id.*

PhotoMedex argues that section 533 and *Downey* do not apply to this case because (1) PhotoMedex never admitted liability in the settlement agreement, and (2) its liability could have been vicarious.  The *Downey* court's holding applies section 533 to those "found personally (as opposed to vicariously) liable for a malicious prosecution claim arising from conduct which is prosecuted under the law of California."  78 Cal. Rptr. 2d at 166.

PhotoMedex did not admit liability in the settlement agreement.  (Pl. Mot. Summ. J. Ex. F at 2.)  Without PhotoMedex's liability for malicious prosecution, PhotoMedex argues that section 533 and *Downey* do not apply to the current case.  The court, however, concludes that California would apply *Downey* and section 533 to this case for two reasons.  First, the court in *Downey* considered an underlying malicious prosecution lawsuit that resulted in a settlement agreement, and the facts of *Downey* do not reveal any admission of liability in that settlement agreement.[8]  Second, a conclusion that *Downey* does not apply would generate conflict between

---

[8] In the appellate and rehearing briefs in *Downey*, the insureds argued that "[t]he Court's decision is based on the erroneous assumption that Appellants had already been adjudged liable for malicious prosecution."  Appellants' Petition for Rehearing at *4, *Downey Venture v. LMI Ins. Co.*, No. B106304, 1998 WL 34311276 (Cal. Ct. App. Sept. 15, 1998).  The *Downey* court presumed that the insured feared liability:

> Indeed, it is clear that this settlement was made at the insistence of the Downey plaintiffs who had every reason to be concerned about the outcome of that litigation after the trial court had adversely resolved the probable cause issue [but not the malice issue] and determined that there was a substantial probability of a punitive damage award.

78 Cal. Rptr. 2d at 166.  I nonetheless conclude that the reasons for applying *Downey* to the current case—where a conclusion of liability is not expressly precluded by the settlement agreement and neither side has placed evidence of settlement motivation before the court—are

the insurer and insured in every malicious prosecution defense because the insured would be motivated to settle its claims without an admission of liability in order to recoup insurance benefits, even if the underlying misconduct was wilful in violation of section 533. This conclusion would undermine California's policy of deterring the underlying tortious conduct by denying indemnity coverage.

PhotoMedex's vicarious liability argument is without factual merit because PhotoMedex's executives and Board of Directors were involved in pursuing the underlying lawsuit against RA Medical. (*E.g.,* McGrath Decl. 2-3.) Therefore, direct, not vicarious liability, was a factual issue in that case, and the court will not engage in plaintiff's speculation regarding possible grounds for liability. Thus, the court concludes that California law would prohibit St. Paul from indemnifying PhotoMedex for the settlement of the malicious prosecution action.

Pennsylvania law conflicts. In Pennsylvania, an insurer is not precluded from indemnifying against malicious prosecutions.[9] Pennsylvania case law strongly suggests that insurers may indemnify against malicious prosecution. *See, e.g., Consulting Eng'rs v. Ins. Co. of N. Am.*, 710 A.2d 82, 86 (Pa. 1988) (assuming that the insurer could lawfully indemnify against malicious prosecution when discussing the date on which the tort occurred for insurance coverage purposes); *see also, e.g., City of Erie v. Guar. Nat'l Ins. Co.*, 109 F.3d 156, 159-160 (3d Cir. 1997) (predicting Pennsylvania Supreme Court law regarding same).

_____

not diminished because the court in *Downey* did not require an evidentiary finding of liability.

[9] In Pennsylvania, the tort of malicious prosecution of civil proceedings is codified as "Wrongful Use of Civil Proceedings," 42 Pa. Cons. Stat. §§ 8351-54.

Furthermore, Pennsylvania policy strongly endorses the enforcement of contractual obligations as written.  Under Pennsylvania law, "[w]hen the language of an insurance contract is clear and unambiguous, a court is required to enforce that language."  *Med. Protective Co. v. Watkins*, 198 F.3d 100, 103 (3d Cir. 1999) (citing *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983)).  The courts "will not lightly invalidate a contract when an assertion is made that the contract violates public policy."  *BLaST Intermediate Unit 17 v. CNA Ins. Cos.*, 674 A.2d 687, 689 (Pa. 1996); *see also Pa. Nat'l Mut. Cas. Co. v. Black*, 916 A.2d 569, 578 (Pa. 2007) ("We have repeatedly emphasized our reticence to throw aside clear contractual language based on the often formless face of public policy." (internal quotation marks omitted)); *Prudential Prop. & Cas. Ins. Co. v. Colbert*, 813 A.2d 747, 750 (Pa. 2002) ("Generally, courts must give plain meaning to a clear and unambiguous contract provision unless to do so would be contrary to a clearly expressed public policy.").  Because Pennsylvania case law strongly suggest that insurers may indemnify against malicious prosecution and because Pennsylvania has no clear statutory policy analogous to California's section 533, the court concludes that Pennsylvania law enforces an insurer's express policy obligation to indemnify for malicious prosecution.  The court therefore holds that there is an actual conflict between the laws of California and Pennsylvania regarding whether an insurer may indemnify the insured for malicious prosecution.

2.     **Applicable Coverage Rates for Attorney Fees and Costs**

California and Pennsylvania law also differ regarding the applicable attorney fee rates that

an insurer must reimburse for covered defenses.[10]  California Civil Code § 2860[11] limits the legal

fees an insurer is required to pay for counsel selected by the insured in cases where coverage

disputes arise between insurer and insured.  *See San Gabriel Valley Water Co. v. Hartford*

*Accident & Indem. Co.*, 98 Cal. Rptr. 2d 807, 815-16 (Cal. Ct. App. 2000) ("Section 2860(c) was

and is clearly intended to impose a limitation on the fee rates insurers must pay to independent

counsel chosen by their insureds."); *County of San Bernardino v. Pac. Indem. Co.*, 65 Cal. Rtpr.

2d 657, 674 (Cal Ct. App. 1997) ("When an insurer's reservation of rights creates such conflict

of interest, section 2860, subdivision (c), imposes a specific limitation on the hourly rate an

insurer must pay to independent . . . counsel selected by the insured.").  Under the statute, the fee

rate is limited to the amount actually paid by the insurer in the ordinary course of business for

similar actions in the same community.  *See San Gabriel Valley Water Co.*, 98 Cal. Rptr. 2d at

816 (rejecting insured's "erroneous proposition that the insured is entitled to payment of the full

fee rates and charges of its independent counsel, so long as 'reasonable.'").

---

[10] There is no dispute that St. Paul was obligated to defend PhotoMedex in the malicious
prosecution action, even under California law.  *See Downey*, 78 Cal. Rptr. 2d at 166 (holding that
"public policy does not preclude a defense and an insurer promising coverage for malicious
prosecution is nonetheless liable to provide a defense to such a claim").  The dispute, as
discussed herein, is over the amount that St. Paul is obligated to cover.

[11] Section 2860(c) states that:

The insurer's obligation to pay fees to the independent counsel selected by the
insured is limited to the rates which are actually paid by the insurer to attorneys
retained by it in the ordinary course of business in the defense of similar actions in
the community where the claim arose or is being defended.

17

By contrast, Pennsylvania law does not limit the amount an insurer is required to pay insured-selected counsel to the amount the insurer actually pays attorneys.  Instead, Pennsylvania law requires insurers to pay reasonable attorney fees and costs to independent counsel.  In Pennsylvania, "[i]t is settled law that where conflicts of interest between an insurer and its insured arise, such that a question as to the loyalty of the insurer's counsel to that insured is raised, the insured is entitled to select its counsel, whose reasonable fee is to be paid by the insurer."  *Rector v. Am. Nat'l Fire Ins. Co.*, No. 00-2806, 2002 U.S. Dist. LEXIS 625, at **29-30 (E.D. Pa. Jan 14, 2002) (internal quotation marks omitted), *aff'd* 97 F. App'x 374, 378 (3d Cir. 2004); *see also Rite Aid Corp. v. Liberty Mut. Fire Ins. Co.*, No. 03-1801, 2006 U.S. Dist. LEXIS 57094, **11-15, 19-20 (M.D. Pa. Aug. 14, 2006) (concluding that the insurer's "duty to defend encompasses reimbursement of all reasonable expenses incurred in [the insured's] defense"); *Krueger Assocs., Inc. v. ADT Sec. Sys. Mid-South, Inc.*, No. 93-1040, 1994 U.S. Dist. LEXIS 18168, at *17 (E.D. Pa. Dec. 20, 1994) (applying Pennsylvania law to conclude that "the insured is entitled to select its counsel, whose reasonable fee is to be paid by the insurer").[12]  The court concludes that Pennsylvania law requires insurers to pay the insured's independent counsel reasonable attorney fees and costs to defend covered cases.

---

[12] PhotoMedex argues that Pennsylvania law requires an insurer to reimburse the insured for all fees and costs incurred in defending the underlying action after the insurer breaches its contractual defense obligations.  *See Rector v. Am. Nat'l Fire Ins. Co.*, 97 F. App'x 374, 378 (3d Cir. 2004); *Gedeon v. State Farm Mut. Auto Ins. Co.*, 188 A.2d 320, 322 n.5 (Pa. 1963); *Zeitz v. Zurich Gen. Acc. & Liab. Ins. Co.*, 67 A.2d 742, 746 (Pa. Super Ct. 1949).  The court must first determine which law applies to the policy before it can determine whether a breach occurred.  Furthermore, a reasonableness standard applies to the selection of replacement counsel by the non-breaching party under the mitigation theory of contract damages.  *See Rector*, 2002 U.S. Dist. LEXIS 625, at **29-30.

An actual conflict thus exists between Pennsylvania law and California Civil Code section 2860(c). Section 2860(c) limits the insurer's liability to the actual rate it pays in the ordinary course of its business in the community, whereas Pennsylvania law awards damages under contractual theory governed by a reasonableness limitation. The court thus concludes that California and Pennsylvania law actually conflict in both relevant areas and will now proceed to classify the conflicts.

### B.    Classifying the Conflict

Following *Hammersmith*, "[i]f there are relevant differences between the laws, then the court should examine the governmental policies underlying each law, and classify the conflict as a 'true,' 'false,' or an 'unprovided-for' situation." 480 F.3d at 230. A "true" conflict exists "if the governmental interests of both jurisdictions would be impaired if their law were not applied." *Id.* (internal quotation marks omitted) (citing *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 n.15 (3d Cir. 1991). A true conflict requires a deeper choice of law analysis. *Id.* (citing, for example, *Cipolla v. Shaposka*, 267 A.2d 854, 856 (Pa. 1970)).

A "false" conflict exists "if only one jurisdiction's governmental interest would be impaired by the application of the other jurisdiction's laws." *Id.* (internal quotation marks omitted) (citing *Lacey*, 932 F.2d at 187). If a false conflict exists, "the court should apply the law of the state whose interests would be harmed if its laws were not applied." *Id.* (internal quotation marks omitted) (citing *Lacey*, 932 F.2d at 187).[13] The parties disagree over the classification of both of the conflicts.

---

[13] "An 'unprovided-for' case is one in which neither state's interests would be impaired if its laws were not applied." *Id.* at 230 n.9. Neither party in this action argues that the conflict analysis results in an unprovided-for case.

### 1.     Indemnification of Malicious Prosecution Lawsuits

The court concludes that a true conflict exists between California and Pennsylvania laws on indemnification of the malicious prosecution action.  St. Paul argues that the difference between California and Pennsylvania laws governing indemnification of malicious prosecution actions presents a false conflict, while PhotoMedex argues that a true conflict exists.  The court must, therefore, examine the governmental interests involved to determine whether application of either state's law will impair the interest of the other state's interests.

California's "fundamental" governmental interest codified in section 533 is to "discourage wilful torts" and "to deny insurance coverage for wilful wrongs." *Downey*, 78 Cal. Rptr. 2d at 154.  It also protects insurers from indemnifying wrongs that do not entail the insured's uncontrollable risk and protects Californians from the harms of wilful torts.  This policy is "both clear and unequivocal." *Id.* at 154 n.32.

Pennsylvania's governmental interest is in the enforcement of insurance contracts as written.  Pennsylvania's plain meaning rule allows the parties "the right to make their own contract," *Topkis v. Rosenzweig*, 5 A.2d 100, 101 (Pa. 1939), and protects their expectations regarding the coverage that the insured purchased and that the insurer offered to provide, *e.g., Pa. Nat'l Mut. Cas. Co.*, 916 A.2d at 578-79.  Here, application of Pennsylvania's law requiring St. Paul to indemnify PhotoMedex under the express provisions of the CGL coverage (*see* Policy, CGL 4-5) for the malicious prosecution settlement would hinder California's codified governmental interest in discouraging wilful wrongs.

St. Paul asserts that because Pennsylvania's law is "silent" on the issue of indemnification for wilful wrongs and application of California law will not harm any Pennsylvania

governmental interest, a false conflict exists.  St. Paul's conclusion is incorrect.  Although

Pennsylvania law has not directly held that insurers may indemnify malicious prosecutions cases,

there is a strong indication that they lawfully may, *see supra* Part A.1.  The governmental interest

in enforcing the plain meaning of insurance policies as written serves the strong policy of

protecting both insurers' and insureds' expectations.  Application of California's law will clearly

hinder this governmental interest.  Moreover, the California court in *Downey* recognized that its

decision denying indemnification was in direct conflict with other states' interests in enforcement

of express insurance contract provisions.  *Downey*, 78 Cal. Rptr. 2d at 164-65 (In some

jurisdictions, "the public policies favoring enforcement of contracts and compensation of injured

third parties are considered paramount and outweigh any concerns about indemnifying wilful

wrongdoers.  Accordingly, in those jurisdictions, an insurer's agreement to cover malicious

prosecution and other wilful misconduct will be enforced as written.").  Applying California's

law will nullify the express agreement that St. Paul was to indemnify PhotoMedex, a

Pennsylvania-based insured, for personal injury such as malicious prosecution.  Therefore, a true

conflict exists between California and Pennsylvania law regarding St. Paul's duty to indemnify

under the policy, and I must analyze the contacts and governmental interests involved to

determine which state's law applies.

**2.      Applicable Coverage Rates for Attorney Fees and Costs**

There is also a true conflict regarding the attorneys fee rates that St. Paul was required to

pay under the policy because either state's interests will be impaired by the application of the

other state's laws.  As previously discussed, one of the policy interests behind California's law is

to protect an insurer from excess expense when paying the insured's independent counsel to

defend a case in which a conflict between the insurer and insured has arisen.[14]  Pennsylvania's rule requiring payment of reasonable expenses in defense of covered lawsuits is intended to place the insured in the same position it would have been in had the insurer selected reasonably priced counsel for complex malicious prosecution cases.  Application of California's limitation on the recovery of attorney fees and costs would impede Pennsylvania's interest in protecting its resident insured's expectations under an insurance contract, and application of Pennsylvania's rule would impair the protection California offers to insurers.

St. Paul argues that because Pennsylvania has no statute or case comparable to section 2860, its law is "silent" regarding the fee rate, and a false conflict exists.[15]  Pennsylvania's legislative silence, however, does not support the conclusion that a false conflict exists.  Pennsylvania's courts award reasonable fees and costs to independent counsel when insurers do not provide insureds with covered defenses, without reference to what insurers actually pay in similar cases.  This law conflicts with section 2860; thus, St. Paul's false conflict argument is unavailing.

---

[14] Generally, section 2860 regulates the duties and rights of the insurer and insured in cases where conflicts arise.  Although the statute contemplates situations where the insurer and insured both retain separate counsel, *see, e.g.*, § 2860(f), the plain language of the provision limiting the insurer's liability to pay for the insured's independent counsel to the amount actually paid by the insurer to attorneys retained by it in the ordinary course of business in the defense of similar actions in the community is not expressly limited to those situations, *see* § 2860(c), as discussed in the text below.  *But see Nat'l Union Fire Ins. Co. v. Hilton Hotels Corp.*, No. 90-2189, 1991 U.S. Dist. LEXIS 20123, at *11 n.5 (N.D. Cal. May 6, 1991).

[15] St. Paul argues that Pennsylvania has no applicable law other than the reasonableness limitation it places on all attorney fees, as described in *Freeze v. Donegal Insurance Co.*, 603 A.2d 595, 602 (Pa. Super. Ct. 1992).  The court at this time need not decide whether the factors detailed in *Freeze* apply to this case.

PhotoMedex argues that California's interest would not be impaired by application of Pennsylvania law.  First, PhotoMedex argues that California's interest in protecting the insurance company may be diminished because St. Paul is not a California-based insurer that California has an interest in protecting.  *Cf. Lacey*, 932 F.2d at 188 (finding that "applying British Columbia's negligence standard would not serve British Columbia's interest" "in promoting domestic industry").  Nonetheless, St. Paul's residency does not nullify California's entire interest because there is no evidence that the rule was intended to protect only those insurers domiciled in California.  *Cf. Hammersmith*, 480 F.3d at 232 ("There is no evidence that New York intended its "no-prejudice" rule to protect only resident insurers, rather than all insurers doing business in the state of New York.").  St. Paul actively insures businesses with operations in California, and, thus, California has an interest in limiting the liability of the insurer and reducing premiums for businesses operating in the state.

Second, PhotoMedex argues that California has a diminished interest in this case because the situation that section 2860 was intended to address—i.e, the insurer paying for two sets of counsel because a conflict exists in the case—is not implicated.  (Pl. Resp. Opp'n Def. Mot. Summ. J. 22-23 (citing *Nat'l Union Fire Ins. Co.*, 1991 U.S. Dist. LEXIS 20123, at *11 n.5 ("Neither [*San Diego Fed. Credit Union v. Cumis Ins. Soc'y*, 208 Cal. Rptr. 494 (Cal. Ct. App. 1984)] nor section 2860 are designed to allow an insurer to cleverly accept an insured-selected counsel as sole counsel for the insured's defense and then be obligated to pay only the 'reasonable costs' portion of the sole counsel's fees.")).)  St. Paul counters that section 2860 is not limited to cases where the insurer pays for two sets of counsel, although it does not dispute that it did not retain separate counsel for defense of the malicious prosecution action.  St. Paul is

correct that section 2860 is not limited to cases where the insurer actively engages separate counsel. Although *Cumis* dealt with a situation involving overlapping counsel, section 2860 by its plain language is not limited to that situation, and it does not require the insurer to actively represent its interests once an insured has taken over the defense of the suit. By its terms, section 2860 is meant to protect insurers from paying excessive rates for independent counsel over whom it has only limited control in selecting. California's policy protects against payments above the insurer's actual rates, which are calculated into the premiums paid by the insured.

Neither party can demonstrate a false conflict favoring the application of either California's or Pennsylvania's laws. A true conflict exists because California's interest in protecting the insurer and Pennsylvania's interest in protecting the insured are at odds.[16]

### C. Contacts and Governmental Interests

Following the protocol outlined in *Hammersmith*, "[i]f a true conflict exists, the [c]ourt must then determine which state has the 'greater interest in the application of its law.'" 480 F.3d at 231 (citing *Cipolla*, 267 A.2d at 856). In Pennsylvania, this methodology requires application of "the approaches of both [the Restatement (Second) of Conflicts] (contacts establishing significant relationships) and 'interests analysis' (qualitative appraisal of the relevant States' policies with respect to the controversy)." *Id.* at 231 (citing *Griffith*, 584 F.2d at 1311). The court must "weigh the contacts on a qualitative scale according to their relation to the policies and interests underlying the [particular] issue," *Shields v. Consol. Rail. Corp.*, 810 F.2d 397, 400

---

[16] Even if a false conflict exists because California has no true interest in the application of its law to an out of state insurer that is not paying two sets of attorneys, Pennsylvania law would nonetheless apply under the contacts and governmental interests analysis discussed in the following section.

(3d Cir. 1987), rather than merely count the contacts, *Cipolla*, 267 A.2d at 856.  For disputes

involving insurance coverage, "[w]eighing these interests requires a further determination as to

which state had the most significant contacts or relationships with the insurance contract."

*Budtel Assocs.*, 915 A.2d at 643.

### 1.      Contacts

Pursuant to *Hammersmith*, the court thus begins its analysis "by assessing each state's

contacts under the [Restatement (Second) of Conflicts of Laws,] bearing in mind that we are

concerned with the contract of insurance and not the underlying tort."  480 F.3d at 231 (citing

*McCabe v. Prudential Prop. & Cas. Inc. Co.*, 514 A.2d 582, 586 (Pa. Super. Ct. 1986)).  In

particular, the court must consider contacts relevant to the current coverage dispute under the

CGL section of the policy regarding defense and indemnification of a malicious prosecution

action.

Section 193[17] of the Restatement (Second) of Conflicts of Laws "specifically governs

casualty insurance contracts."  *Id.* at 233.  It "determines such questions as . . . what risks are

covered by the policy [and] . . . whether in the case of liability insurance the insured can recover

from the company the cost of defending an action involving a risk covered by the policy."  § 193

cmt. a.  Under § 193, "the relevant consideration is the location of the risks covered by the

---

[17] Section 193 states:

>    The validity of a contract of fire, surety or casualty insurance and the rights
> created thereby are determined by the local law of the state which the parties
> understood was to be the principal location of the insured risk during the term of
> the policy, unless with respect to the particular issue, some other state has a more
> significant relationship under the principles stated in § 6 to the transaction and the
> parties, in which event the local law of the other state will be applied.

contract at the time the contract was entered into and throughout the term of the contract, not where any given insured risk came to fruition." *Cont'l Ins. Co. v. Beecham, Inc.*, 836 F. Supp. 1027, 1036 (D.N.J. 1993); *accord Employers Mut. Cas. Co. v. Lennox Intern., Inc.*, 375 F. Supp. 2d 500, 506 (S.D. Miss. 2005) ("[A]n analysis that simply equates location of the 'risk' with the location of the occurrence that creates liability[] renders the concept of 'principal' location of the risk superfluous.").

Thus, the principal location of the insured risk,[18] as understood by the parties, carries "greater weight than any other single contact," "provided that the risk can be located, at least principally, in a single state." § 193 cmt. b; *see also United Brass Works, Inc. v. Am. Guar. & Liab. Ins. Co.*, 819 F. Supp. 465, 469 (W.D. Pa. 1992) ("Section 193 creates a presumption that the state which contains the principal location of the risk has the most substantial relationship to any disputes regarding insurance coverage for that particular risk.").[19]   "Situations where [locating the principal place of risk as understood by the parties] cannot be done, and where the

---

[18] According to comment *a* of § 193, "[a]n insured risk, namely the object or activity which is the subject matter of the insurance, has its principal location, in the sense here used, in the state where it will be during at least the major portion of the insurance period."  For example, the insured risk for defense of a lawsuit may be the risk of a claim being filed at a given location, whereas the insured risk for indemnification may be the risk of loss of the insured's assets.  *See generally, e.g., Babcock & Wilcox Co. v. Arkwright-Boston Manu. Mut. Ins. Co.,* 867 F. Supp. 573, 579-80 (N.D. Ohio 1992).

[19] The focus is on the principal location of risk for three reasons:

> first, it is the state in which the risk is located that also creates the obligations and rights of the parties toward that risk; second, it is likely that the parties would have assumed that the law where the primary risk was located would control insurance coverage questions as well; and third, the state in which the risk is located has a 'natural interest' in the resolution of coverage questions.

*United Brass Works*, 819 F. Supp. at 469 n.2 (citing § 193 cmt. c).

location of the risk has less significance, include . . . where the policy covers a group of risks that are scattered throughout two or more states." § 193 cmt. b.

In this case, the general provision of § 193 does not apply because the parties did not anticipate a principal location of the insured risk with respect to malicious prosecution actions. The personal liability section of the policy covers the risk of malicious prosecution throughout the United States, Puerto Rico and Canada.[20]  (*See* Policy, CGL 8-9.)  Even if the insured risk was more likely to occur in states where PhotoMedex maintained offices, the insured risk is not limited to particular PhotoMedex locations.  Malicious prosecution is a transient risk that could arise in any jurisdiction.  *See Fluke Corp. v. Hartford Accident & Indem. Co.*, 34 P.3d 809, 816 (Wash. 2001) (en banc).[21]  Although PhotoMedex is correct to assert that the parties to the dispute knew Montgomeryville, Pennsylvania was PhotoMedex's headquarters, the contract for personal liability coverage for the risk of malicious prosecution, by its plain language, covers risk nationwide.  In this case, there is no principal location of the insured risk, so the significance of

---

[20] In fact, the only state where such liability may not arise is Georgia, whose endorsement expressly disavows such coverage and would be enforceable as an express term even under Pennsylvania law.

[21] The Supreme Court of Washington's en banc holding in *Fluke* is highly persuasive because it addresses the conflict between California's indemnification prohibition and Washington's policy of upholding the express language of an insurance agreement, which mirrors Pennsylvania's policy.  *See Fluke*, 34 P.2d at 812, 815.  The Washington court considered the insurer's argument that California was the principal location of the risk because it was the state in which the insured filed the patent infringement suit that became the subject of the malicious prosecution action.  *Id.* at 815-16.  The court, however, rejected application of comment *f* to § 193 based on the unidentifiable location of risk of malicious prosecution lawsuits.  Instead, the court applied the factors found in the Restatement (Second) of Conflicts of Laws § 188(2).  *Id.* at 815.

that factor is "greatly diminished," *Compagnie*, 880 F.2d at 690, and § 193 is "largely

inapplicable," *Hammersmith*, 480 F.3d at 233.[22]

St. Paul argues that § 193 comment *f* [23] applies to render the policy at issue subject to

California law because is undisputedly a "multi-state policy." (*See* McEwen Dep. 133:3-114:18.)

Comment *f* directs the courts to treat the multi-risk, multi-state policies as separate contracts

governed by the laws of each state when the parties have incorporated special statutory forms.

The narrowness of comment *f*, as applied under Pennsylvania law, however, is evident in the

overall context of the Restatement (Second)'s "preference that only one set of laws govern a

given insurance contract, and a disapproval of the possibility that the laws of different

_____

[22] The nationwide CGL policy in particular undermines the reasons underlying the focus on the principal location of the insured risk as understood by the parties. First, while the state in which the risk that has come to fruition has passed laws regulating the obligations and rights of the parties toward that risk, so have forty-nine other states and the foreign nations covered under the policy. Second, the parties have not expressly assumed a primary risk location to control insurance coverage questions, since by definition the CGL portion covers the entire nation. And third, the natural interest of each of the states in which the risk is located is greatly diminished by the multitude of other potential locations, thus, increasing the relative importance of the state of contracting's natural interest in the resolution of coverage questions.

[23] For multi-risk policies, comment *f* to § 193 provides:

A special problem is presented by multiple risk policies which insure against risks located in several states. A single policy may, for example, insure dwelling houses located in states X, Y and Z. These states may require that any fire insurance policy on buildings situated within their territory shall be in a special statutory form. If so, the single policy will usually incorporate the special statutory forms of the several states involved. Presumably, the courts would be inclined to treat such a case, at least with respect to most issues, as if it involved three policies, each insuring an individual risk. So, if the house located in state X were damaged by fire, it is thought that the court would determine the rights and obligations of the parties under the policy, at least with respect to most issues, in accordance with the local law of X. In any event, that part of a policy which incorporates the special statutory form of a state would be construed in accordance with the rules of construction of that state.

jurisdictions might apply to different risks under the policy." *United Brass Works*, 819 F. Supp.
at 469 & n.3 (distinguishing comment *f* because of the narrowness of its application); *see also*
*Hammersmith*, 480 F.3d at 233.[24]

In this case, comment *f* to § 193 does not apply for the same reasons that the general
provision of § 193 does not apply, even if the policy is multi-state.  The policy contains state-
specific "required endorsements" for Alabama, Arkansas, California, Florida, Georgia, Maryland,
Pennsylvania, Tennessee, and Wisconsin.  (Policy, Form List 1.)  Furthermore, St. Paul
calculated different premiums for Pennsylvania, California, and Alabama based on the risk
exposure and the location of facilities.  (McEwen Dep. 114:14-116:13.)  Nonetheless, unlike the
facility-specific fire insurance example provided in comment *f*, and potentially anticipated under
other location-specific portions of the current policy, the risk of personal liability for a malicious
prosecution lawsuit could manifest itself in any state.  *See, e.g.*, *Fluke Corp.*, 34 P.3d at 816
("Comment *f* is not applicable here, however, because it presumes that, at the time of contracting,
the risks could be localized in particular states. . . . [T]he location of the patent infringement and
malicious prosecution suits could not have been 'understood' by the parties at the time of
contracting, as section 193 requires; rather, at the time of contracting, the locations of [insured's]

---

[24] The scope of comment *f* has been greatly disputed.  Some courts relegate it only to
situations requiring statutory forms, *see, e.g.*, *United Brass Works*, 819 F. Supp. at 469; *Cont'l
Ins. Co.*, 836 F. Supp. at 1036, while others view it more expansively as applying to all multi-risk
contracts, *see, e.g.*, *Curran Composites, Inc. v. Liberty Mut. Ins. Co.*, 874 F. Supp. 261, 264
(W.D. Mo. 1994); *Pioneer Chlor Alkali Co. v. Nat'l Union Fire Ins. Co.*, 863 F. Supp. 1237,
1240 (D. Nev. 1994).  This court will interpret comment *f* narrowly in light of *Hammersmith*'s
citation to *United Brass Works* and conclusion that Pennsylvania law favors application of one
state's laws to interpret a policy.

vulnerability to a malicious prosecution were unidentifiable and infinite." (internal quotation marks and citation omitted)).

Furthermore, the California endorsement in no way alters the personal liability coverage to bring the policy within the ambit of comment *f*. The endorsement does not discuss personal liability, section 533, section 2860(c), or *Downey*, and concludes with the statement "All other terms of your policy remain the same." There is simply no ground to hold that the endorsement created a separate California contract governing the relevant risks.[25] This conclusion is consistent with Pennsylvania choice-of-law policy that is "concerned with the contract of insurance, and not the underlying tort" and that prefers "that only one set of laws govern a given insurance contract." *Hammersmith*, 480 F.3d at 233 (citing *McCabe*, 514 A.2d at 586).

Under Pennsylvania's flexible approach, as outlined in *Hammersmith*,[26] where § 193 is inapplicable the court next applies contract-related contacts identified in the Restatement (Second) of Conflicts of Laws § 188(2) with reference to the helpful general policies identified in the Restatement (Second) of Conflicts of Laws § 6. *See* 480 F.3d at 233; *Knauer v. Knauer*, 470 A.2d 553, 557-58 (Pa. Super. Ct. 1983); *Normann v. Johns-Manville Corp.*, 593 A.2d 890, 894

---

[25] Nor does the "conformity clause" dictate such a result. The policy states that "[a]ny part of this policy that conflicts with state law is automatically changed to conform to the law." (Policy, General Rules 3.) The court will conform the policy to the applicable substantive state law; the clause does not override the choice of law analysis in favor of the insurer.

[26] St. Paul argues that *Hammersmith*'s subsequent examination of § 188 after finding § 193 inapplicable is limited to the context of product liability cases because comment *a* of § 193 expressly states that product liability cases are controlled by § 188 and that multi-state liability cases are controlled by comment *f* of § 193. In reviewing both *Hammersmith* and comment *a*, it is clear that St. Paul's interpretation of comment *a* is flawed. As discussed above, the holding and logic of *Hammersmith* apply with equal force to multi-state risks, which fit into the same analytical framework as product liability risks in terms of geographic distribution and unpredictability.

30

(Pa. Super. Ct. 1991).[27]   Section 188(2) provides that "the contacts to be taken into account in

applying the principles of § 6 to determine the law applicable to an issue include:  (a) the place of

contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the

location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of

incorporation and place of business of the parties."  "These contacts are to be evaluated

according to their relative importance with respect to the particular issue."  *Id.*

    Using this holistic approach, the court concludes that Pennsylvania has the most

substantial contacts with and strongest governmental interest in the policy's coverage of defense

and indemnity of the malicious prosecution action.  As noted above, in Pennsylvania choice of

law analysis for the subject of policy interpretation and coverage, the focus is on contacts related

to the insurance contract, not the underlying tort.  Pennsylvania's contacts are related to the

---

[27]  St. Paul argues that the court should apply the policies outlined in § 6 without
reference to § 188 because § 188(2) is based on outdated *lex loci* factors that the *Griffith* court
rejected and because § 193 dictates the application of § 6's factors.  St. Paul relies heavily on
*General Ceramics, Inc. v. Firemen's Fund Insurance Cos.*, 66 F.3d 647 (3d Cir. 1995), to
support its conclusion that I should next consider only § 6.  In *General Ceramics*, the Third
Circuit applied New Jersey choice of law rules to § 193, concluding that the New Jersey Supreme
in *Gilbert Spruance Co. v. Pa. Mfrs. Ass'n Ins. Co.*, 629 A.2d 885 (N.J. 1993), applied a site-
specific approach for multistate risks.  "In such cases, there is no presumption and 'the governing
law is that of the state with the dominant significant relationship according to the principles set
forth in Restatement § 6,' applied with reference to the particular controversy involved and not
merely to parties and the circumstances of the original contract."  *Gen. Ceramics*, 66 F.3d at 653
(citing *Gilbert Spruance*, 629 A.2d at 893).  The New Jersey court chose this approach because
"the uniform interpretation of policy language, while desirable, does not justify courts ignoring
'the significant governmental interest[s] of the various jurisdictions where the insured risks are
located.'"  *Gilbert Spruance*, 629 A.2d at 891 (citations omitted).  The Third Circuit's analysis in
*General Ceramics* under New Jersey law is not relevant to this case because Pennsylvania choice
of law principles emphasize different policies, focusing more determinatively, for example, on
the contacts relating to the original insurance contract and the uniform interpretation of the
policy.  *See, e.g.*, *Budtel Assocs.*, 915 A.2d at 643; *McCabe*, 514 A.2d at 586.  The court will
instead follow *Hammersmith*, which under Pennsylvania law, proceeded directly to § 188(2)
factors after rejecting § 193's applicability.

policy and are weighty considering the state's interest in protecting the expectations of the parties, whereas California's contacts are only related to the underlying tort.

Contacts (a) and (b) of § 188(2) clearly favor application of Pennsylvania law. The policy was negotiated, written, produced, delivered, and signed in Pennsylvania. St. Paul's Blue Bell office representatives McEwen and Yu delivered the policy to PhotoMedex's Montgomeryville office through Aon's Philadelphia office. (*See* Pl. Mot. Summ. J. Ex. C, McEwen Dep. 24:22-26:22, 49:9-22, 82:8-85:14); *see also Hammersmith* 480 F.3d at 233 (holding that "[a]n insurance contract is made in the state where it is delivered"). Negotiations over the policy's content likewise occurred solely in Pennsylvania, among representatives of PhotoMedex's headquarters, Aon's Philadelphia office, and St. Paul's Blue Bell office. (*See* Pl. Mot. Summ. J. Ex. C, McEwen Dep. 28:8-31:9, 31:12-33:3, 67:3-69:20, 81:11-82:7.) Contact (c) of § 188(2) also favors Pennsylvania because PhotoMedex paid its premiums through Cananwill, an Aon subsidiary located in Philadelphia. (*See* McEwen Dep. 50:1-52:20); *see also Hammersmith*, 480 F.3d at 234 n.13 (noting that "an insurance contract is performed where the premiums are received").[28]

Regarding contact (e) of § 188(2),[29] PhotoMedex has its headquarters and principal location in Pennsylvania, although it is incorporated in Delaware. PhotoMedex, however, conducts business in many states, including California. St. Paul's domicile in Minnesota is not

---

[28] This contact is of less relevance to the dispute over the content of coverage; however, it bolsters Pennsylvania's interest in enforcing the contract on behalf of its local insured.

[29] The location of the subject matter of the contract under contact (d) is neutral. This contact refers to the location of the insured risk. *See Hammersmith*, 480 F.3d at 234. As I have previously concluded, the "insured risk in this case is spread throughout numerous states and countries. Therefore, this factor is neutral." *See id.*

relevant to the current analysis.  Section 188 comment e explains that the significance of the parties' domiciles "depends largely upon the issue involved and upon the extent to which they are grouped with other contacts."  PhotoMedex's principal location becomes more significant when grouped with the contacts (a) through (c), while the maintenance of a place of business in California becomes less relevant.  This factor thus leans toward application of Pennsylvania law.[30]

Pennsylvania's substantial contacts are especially relevant when weighed according to the policy considerations under § 6.[31]  Pennsylvania has an interest in enforcing insurance contracts negotiated and delivered in Pennsylvania primarily for the benefit of a Pennsylvania insured.  Application of Pennsylvania substantive law also protects the justified expectations of its resident insured and the foreign insurer that executed the policy in Pennsylvania.[32]  Finally, application of Pennsylvania law supports predictability in applicability of substantive law because the place of negotiation and delivery are often more predictable than the place of tort and supports uniformity in deciding on the applicable substantive law for a given policy that covers multiple torts.  St.

---

[30] The other contacts to which St. Paul points—for example the location of the alleged malicious prosecution in California, the Californian residencies of the plaintiffs in the subsequent malicious prosecution action, and the lawsuit-related depositions occurring in California—all relate to the underlying tort, not the insurance contract.  In fact, California has no contacts with the insurance policy; its interest is based solely on the underlying tort.

[31] Section 6 lists the policies that are helpful in determining the importance of any given contact:  (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability, and uniformity of result; and (g) ease in the determination and application of the law to be applied.

[32] Neither party demanded a choice of law clause be incorporated in the policy, which would have been the best way to protect any expectations.

Paul is simply incorrect to argue that the happenstance location of the underlying tort provides predictability in interpretation of an insurance policy covering a nationwide risk.[33]  In conclusion, the significant contacts surrounding the contract for insurance are centered in Pennsylvania.

2.      **Governmental Interests**

According to *Hammersmith*, the second part of Pennsylvania's contact/interest step in this choice of law analysis is to consider the governmental interests involved.  *See* 480 F.3d at 235. These interests have been discussed at length above, so the court will only briefly reiterate them here.  California has codified interests in preventing the indemnification of a wilful tort and in limiting the defense fee rates paid by the insurer in cases of conflict.  Its law preventing insurance indemnification for wilful torts aims to prevent intentional misconduct in its state and protect its citizens from such misconduct.  It is designed to prevent insured parties from engaging in malicious prosecutions, as PhotoMedex was accused of doing in the underlying malicious prosecution action.[34]  California also has an interest in preventing excessive fee rates for counsel selected by insureds at the expense of the insurer.  California's law places the insured in the same position it would have been had the insurer been able to defend it without a conflict, protecting the insured by granting it independent counsel while preventing excessive costs above the typical

_____

[33] As noted above, St. Paul argues that under § 193, the court should skip analysis of the contacts outlined in § 188 and proceed directly to the policy considerations of § 6.  In addition to rejecting this interpretation, the court concludes that the result of such an analysis would be the same.  Analysis under the broad policy considerations of § 6 would be formless without some reference to specific, factual contacts, and as discussed in the text and directed by Pennsylvania choice of law principles, *see Hammersmith*, 480 F.3d at 233, the relevant, factual contacts for an insurance contract are outlined in § 188.

[34] The court notes that an interest in deterrence "is not as strong in the case of contract actions because the parties to a contract are more readily able to take into account in advance the law that will govern their contractual disputes."  *Melville*, 584 F.2d at 1309 n.5.

rates paid by the insurer.  The law creates a balance that the facts of this case dislodge, as PhotoMedex selected counsel at a significantly higher rate than the insured alleges it pays in the ordinary course of business for similar defenses.  While California's interests in this case appear strong and focused, its prohibition on indemnification is more closely related to the regulation of the underlying tort than the interpretation of the contract at hand; additionally, while its limit on defense fees is more closely related to preventing conflicts between the insured's and insurer's counsel during covered lawsuits.

Pennsylvania's interests, which are more general and are not codified, but are no less strong, are directly related to the interpretation of the policy.  Pennsylvania has a significant interest in regulating and enforcing insurance contracts negotiated, issued and delivered in Pennsylvania for the protection of the expectations of insureds that paid premiums in the state. Pennsylvania's interest is in enforcing a policy executed under its laws as written according to its plain meaning.  Considering the qualitative strength of Pennsylvania's contacts as they relate to its policy, and Pennsylvania's direct interest in regulating the interpretation of that policy, rather than the underlying tort, the court concludes that Pennsylvania has a stronger governmental interest in applying its substantive law to the interpretation of the policy.

Thus, in this case actual conflicts exist between California's and Pennsylvania's relevant laws, and Pennsylvania has stronger qualitative contacts with the issue of policy interpretation and stronger governmental interests in applying its substantive laws to that interpretation.  The court will, therefore, apply Pennsylvania's substantive law to the interpretation of the policy.

35

**IV.    SUMMARY JUDGMENT**

    **A.    Summary Judgment Standard**

Either party to a lawsuit may file a motion for summary judgment, and it will be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Lebatt, Ltd.*, 90 F.3d 737, 743 (3d Cir. 1996) (citation omitted).

The nonmoving party must present concrete evidence supporting each essential element of its claim. *Celotex*, 477 U.S. at 322-23. However, "[t]he evidence of the non-movant is to be believed," and "[a]ll justifiable inferences are to be drawn in [the nonmoving party's] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Nonetheless, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted). Where, as here, the parties have filed cross-motions for summary judgment, "Rule 56(c) does not mean that the case will necessarily be resolved at the summary judgment stage. . . . Each party must still establish

36

that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Atl. Used Auto Parts v. City of Phila.*, 957 F. Supp. 622, 626 (E.D. Pa. 1997).

### B.      Indemnification

The court will grant PhotoMedex's motion for summary judgment to the extent that St. Paul is not entitled to recoup from PhotoMedex $800,000 of the $1,050,000 that St. Paul paid to settle the malicious prosecution action. The court will deny St. Paul's motion for summary judgment as to St. Paul's claim that it had no duty to indemnify PhotoMedex and will deny St. Paul's counterclaim for reimbursement.

Under Pennsylvania law, "[w]hen the language of an insurance contract is clear and unambiguous, a court is required to enforce that language." *Med. Protective Co. v. Watkins*, 198 F.3d 100, 103 (3d Cir. 1999) (citing *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983)). In this case, the policy expressly indemnifies PhotoMedex for "personal injury liability" that "results from your business activities" caused by "a personal injury offense," including "malicious prosecution." (Policy, CGL 4.) Thus, absent other language, the policy obligated St. Paul to indemnify PhotoMedex for the underlying malicious prosecution action.

Despite St. Paul's arguments to the contrary, the "conformity clause" does not alter this conclusion. As noted above, the conformity clause states that "[a]ny part of this policy that conflicts with state law is automatically changed to conform to the law." (Policy 3.) St. Paul argues that if Pennsylvania substantive law governs the policy, under that law the court is bound to apply the express language of the conformity clause, "mandat[ing] that California law be applied and that the policy be conformed to California law." (Def.'s Reply Br. at 5.) St. Paul's

37

argument is unavailing.[35]  The conformity clause adjusts the policy to make it compatible with

Pennsylvania's applicable substantive law where the policy conflicts with that law; the clause

does not act as a default, under-the-radar choice of law provision incorporating California's law,

or for that matter every other state's law, in the face of contradictory Pennsylvania law.

Similarly, the California Required Endorsement does not expressly or impliedly alter St.

Paul's commitment regarding personal liability coverage.  By its terms, that endorsement does

not mention, alter, amend, or otherwise discuss the policy's personal liability coverage.  If St.

Paul intended to limit coverage, it could have done so expressly, as it did in the Georgia Required

Endorsement.  The Georgia Required Endorsement expressly excluded from coverage intentional

acts committed with the intent to cause a loss.[36]  (Policy, Georgia Required Endorsement 2.)  In

contrast, the California Required Endorsement contains no similar disclaimer and, after stating

some differences applicable to California incidents that are not relevant to the present case,

_____

[35] The interpretation that St. Paul espouses would render Pennsylvania's choice of law
analysis unnecessary for any contract containing such a clause, even though the conformity
clause is not a choice of law clause, and would similarly render the state-specific endorsements
expressly incorporated into the current policy superfluous.  The court will not entertain this
illogical and inconsistent reading of the conformity clause.

[36] As noted above, the Georgia Required Endorsement states:

> Intentional Acts.  The following applies to any agreement included that's part
> of your policy.
>> 1.  The following is added to the Exclusions – Losses We
>> Won't Cover, or similarly titled, section:
>>> We won't pay for loss or damage caused by any act
>>> committed:
>>>> • by or at the direction of any
>>>>   protected person; and
>>>> • with the intent to cause a loss.

(Policy, Georgia Required Endorsement 2.)

concludes with the statement "[a]ll other terms of your policy remain the same", (Policy, California Required Endorsement 3), confirming the court's conclusion that the endorsement does not alter personal liability coverage.

The following facts are undisputed.  On November 4, 2004, Irwin and RA Medical sued PhotoMedex and its employee Levatter for malicious prosecution in the San Diego Superior Court of the State of California the case *Irwin et al. v. Jenkins & Gilchrist, LLP, et al.*, No. GIC 839208.  (Pl. Facts ¶ 5; Def. Facts ¶ 6; Def. Mot. Summ. J. Ex. B.)  On May 17, 2007, the parties held a settlement conference before Judge Lewis.  (Pl. Mot. Summ. J. Ex. E, Rep.'s Tr. Settlement Conf. 6-7.)  Matsufuji represented St. Paul and was authorized to settle on its behalf. (*Id.* 12-13.)  The parties agreed to settle the malicious prosecution action for $1,200,000, in exchange for dismissal of all claims with prejudice.  (*Id.* 8; Pl. Facts ¶ 53; Def. Facts ¶ 8.) Pursuant to the agreement, the malicious prosecution case was dismissed with prejudice, and St. Paul paid R.A. Medical $1,050,000 to settle the case on behalf of its insured PhotoMedex.  (Pl. Facts ¶ 62; Def. Resp. to Pl. Facts ¶ 62.)  Because the contract will be enforced according to Pennsylvania law and, therefore, its plain meaning as written, St. Paul was obligated to indemnify PhotoMedex in the malicious prosecution action.  Thus. St. Paul is not entitled to recover the $800,000 it now requests based on its reservation of rights under California law.  The court will grant PhotoMedex's motion for summary judgment and deny St. Paul's motion for summary judgment on the issue of St. Paul's duty to indemnify and right to reimbursement.[37]

---

[37] PhotoMedex raises a second, independent basis for denying reimbursement to St. Paul—that one who voluntarily makes a payment under a mistake of law cannot recover that payment.  Courts in other states have applied this doctrine to an insurer's indemnification of an insured under a mistaken presumption of coverage. *See, e.g.*, *Home Ins. Co. v. Honaker*, 480 A.2d 652, 653 (Del. 1984).  *But see Blue Ridge Ins. Co. v. Jacobsen*, 22 P.3d 313, 322 (Cal.

## C.       Attorney Fees and Costs

The court will grant PhotoMedex partial summary judgment on the limited issue that

Pennsylvania law controls the attorney fee rates that St. Paul must pay under the policy, will deny

PhotoMedex's motion for summary judgment seeking fees and cost totaling $914,466.70, and

will deny St. Paul's motion for summary judgment asking the court to declare California law

controlling with respect to the fee rate it must pay under the policy.  In Pennsylvania, "[i]t is

settled law that where conflicts of interest between an insurer and its insured arise, such that a

question as to the loyalty of the insurer's counsel to that insured is raised, the insured is entitled

to select its counsel, whose reasonable fee is to be paid by the insurer."  *Rector*, 2002 U.S. Dist.

LEXIS 625, at **29-30 (internal quotation marks omitted) (citing *Krueger Assoc., Inc. v. ADT*

*Sec. Sys., Mid-South, Inc.*, No. 93-1040, 1994 U.S. Dist. LEXIS 18168, at *17 (E.D. Pa. Dec. 20,

1994))*, aff'd,* 97 F. App'x 378.  The determination of a reasonable fee is a fact-intensive inquiry,

requiring competent evidence.  *See Rite Aid Corp. v. Liberty Mut. Fire Ins. Co.*, No. 03-1801,

2006 U.S. Dist. LEXIS 57094, *12 (M.D. Pa. Aug. 14, 2006) (requiring invoices, detailed

accountings of the hours billed, and the testimony of lead counsel regarding the complexity of the

case, necessity and reasonableness of the hours and rates billed, and full payment of the costs by

_____

2001).  Pennsylvania courts have noted that the general doctrine applies in Pennsylvania, *see*
*Acme Mkts., Inc. v. Valley View Shopping Ctr., Inc.*, 493 A.2d 736,737 (Pa. Super. Ct. 1985), but
they have not been asked to apply it to an insurer's mistaken indemnification.  Federal courts
applying Pennsylvania law have applied the doctrine to an insurer's payment of defense costs,
but have done so for policy reasons regarding attorney conflict standards that do not apply with
equal force to indemnity payments.  *See Terra Nova Ins. Co., Ltd. v. 900 Bar, Inc.*, 887 F.2d
1213, 1219-20 (3d Cir. 1989); *Coregis Ins. Co. v. Law Offices of Carole F. Kafrissen, P.C.*, 140
F. Supp. 2d 461 (E.D. Pa. 2001).  Because the court has decided the issue under an express
contractual theory, it need not at this time decide if the Pennsylvania Supreme Court would
extend the voluntary payment doctrine to insurance indemnity payments made under a full
reservation of rights by the insurer.

the insured); *see also Freeze v. Donegal Ins. Co.*, 603 A.2d 595, 602 (Pa. Super. Ct. 1992)

(requiring Pennsylvania courts to determine fee rates based on "the amount of work performed;

the character of the services rendered; the difficulty of the problems involved; the importance of

the litigation; the amount of money or value of the property in question; the degree of

responsibility incurred; whether the fund involved was 'created' by the attorney; the professional

skill and standing of the attorney in his profession; the result he was able to obtain; . . . and, very

importantly, the amount of money or the value of property in question").

 In this case, the parties do not dispute St. Paul's duty under the policy to pay for

independent defense counsel for PhotoMedex; the only summary judgment disputes are what fee

rate St. Paul is obligated to pay the independent counsel and whether St. Paul breached its duty

when it offered to pay the rates it purports to actually pay for defense of similar actions.  St. Paul

investigated the malicious prosecution suit and sent PhotoMedex a letter on January 31, 2007,

advising that St. Paul agreed to provide a defense to the malicious prosecution lawsuit.  (Pl. Mot.

Summ. J. Ex. D, Letter from Pam Matsufuji to Dave Woodward, Jan. 31, 2007.)  The

correspondence advised that PhotoMedex was entitled to reimbursement for representation it

selected at the hourly rate of $175 for counsel and $100 for paralegals, the rate St. Paul purported

to actually pay attorneys in the ordinary course of business for defense of similar actions in San

Diego County.  (*Id.* at 8-9.)  The letter also provided means for monitoring the qualifications and

coordinating the activities of the independent counsel.  (*Id.* at 9.)  PhotoMedex notified St. Paul

that it had retained its own counsel, choosing David L. Schrader and Christina Stein of the Los

Angeles office of Morgan, Lewis, and Bockius, LLP, with hourly rates of $685 and $360

respectively.  (Pl. Mot. Summ. J. Ex. D, Letter from Marianne Bechtle to Pamela Matsufuji 2,

Mar. 9, 2007.)  PhotoMedex maintained that Pennsylvania law governed the policy, allowing it

to select independent counsel at a reasonable rate.  (*Id.*)  In that letter, however, PhotoMedex

noted that the disagreement over compensable defense fees "need not be further argued in this

context given the pendency of the lawsuit by PhotoMedex against St. Paul where coverage issues

will be resolved," referring to the present lawsuit filed by PhotoMedex.  (*Id.* at 1-2.)  By the end

of the litigation, PhotoMedex submitted invoices totaling $914,466.70 for expenses incurred

prior to the settlement.

Based on these undisputed facts, the court cannot grant summary judgment on the actual

fee rate that St. Paul must pay PhotoMedex's independent counsel for the defense of the

underlying malicious prosecution action.  PhotoMedex has not presented the court with

competent evidence, such as expert testimony, a survey of fees charged for similar cases by

typical law firms in San Diego county, or any other evidence based on which the court could

conclude that there is no genuine issue regarding the reasonableness of PhotoMedex's request for

nearly a million dollars in attorney fees stemming from hourly fee rates of $685 and $360.

Additionally, PhotoMedex argues that St. Paul was in material breach of the policy when

it offered to pay $175 for counsel and $100 for paralegals; thus, St. Paul is liable to PhotoMedex

for the full amount it paid to find suitable replacement counsel under a breach of contract theory.

*See Rector*, 97 F. App'x at 378 (holding that "'[a]n insurer's failure or refusal to defend a claim

within the scope of an insurance policy constitutes a breach of contract for which it is subject to

damages recoverable in an action of assumpsit'" (quoting *Vanderveen v. Erie Indem. Co.*, 208

A.2d 837, 838 (Pa. 1965)).[38]  Even under this breach of contract theory, the court will deny

PhotoMedex summary judgment for its requested costs because two genuine issues of material

fact exist.  First, defendant has raised an issue of material fact regarding whether its letter

offering coverage breached its contractual obligation under the policy.  While acknowledging the

duty to defend does not insulate the insurer from liability for breach of contract when the insurer

later fails to comply with its obligation, *see Rector*, 97 F. App'x at 376-78, under Pennsylvania

law, an insurer may reserve its rights without materially breaching the policy, *see, e.g.*, *Aetna Life*

*& Cas. Co. (Cas. & Surety Div.) v. McCabe*, 556 F. Supp. 1342, 1354 (E.D. Pa. 1983).  St. Paul

acknowledged the duty to pay for independent counsel at the same time it reserved its right to

limit fees, and PhotoMedex proceeded to select its own counsel on the assumption that the

present action would resolve the fee dispute.  (*See* Pl. Mot. Summ. J. Ex. D, Letter from

Marianne Bechtle to Pamela Matsufuji 1-2, Mar. 9, 2007.)

Second, defendant has raised an issue of material fact regarding the reasonableness of

plaintiff's requested damages under the breach of contract theory.  After breaching a contract, the

nonbreaching party has an obligation to mitigate damages by selecting defense counsel with a

reasonable fee warranted by the case.  *See Rector*, 97 F. App'x at 378 (holding that "the [insured]

was entitled to declare [the insurer] in breach, provide its own defense, and look to [the insurer]

---

[38] Although I recognize that unpublished opinions lack precedential value, I cite to them
in this memorandum as persuasive authority when I find their reasoning convincing and their
facts analogous to the situation before me.  *Cf. City of Newark v. U.S. Dep't of Labor*, 2 F.3d 31,
33 n.3 (3d Cir. 1993) ("Although we recognize that this unpublished opinion lacks precedential
authority, we nonetheless consider persuasive its evaluation of a factual scenario virtually
identical to the one before us in this case.").

for reimbursement of the *reasonable* cost of that defense" (emphasis added).[39]  Assuming,

without deciding, that St. Paul breached its contractual obligations, the court cannot conclude

that the fees charged by PhotoMedex's replacement counsel were reasonable.  Thus, disputed,

genuine issues of material fact remain, and the court will not grant summary judgment on this

issue.


V.      **CONCLUSION**

        The court will grant PhotoMedex's motion for summary judgment on the issue of

controlling law, holding that Pennsylvania law applies, and deny St. Paul's cross motion for

summary judgment seeking an order that California law controls.  Subsequently, the court will

grant PhotoMedex's motion for summary judgment that it is not required to reimburse St. Paul

for $800,000 that St. Paul paid to settle the malicious prosecution action against PhotoMedex and

deny St. Paul's cross motion seeking reimbursement.  The court will, however, deny

PhotoMedex's motion for summary judgment regarding the specific request of $914,466.70 in

_____

        [39] In *Rector*, the Third Circuit found a breach of insurance contract where the insurer
"retained the right, as well as the duty, to select and pay counsel."  *Id.* at 376.  Despite
acknowledging its duty to defend and unsuccessfully attempting to find counsel at its preferred
rates, the insurer had not provided counsel through five months after the suit was filed, when the
insured wrote the insurer a letter "advising it that the [insured] regarded [the insurer] as being in
breach of its duty to provide a defense, and that the [insured] would conduct its own defense and
look to the [insurer] for reimbursement."  *Id.* at 377.  The Third Circuit agreed that the insurer
was in breach of contract at that point and that the insured was entitled to reimbursement for
reasonable costs and fees incurred in defense, affirming the district court's judgment of costs.  *Id.*
The district court had ordered that the insurer was liable for "reasonable fees and expenses
incurred by independent counsel," and pursuant to that order, it entered judgment in favor of the
insured for amounts stipulated by the parties.  *Rector*, 97 F. App'x at 375; *Rector*, 2002 U.S.
Dist. LEXIS 625, at *34.  This ruling does not suggest that the insurer is liable for any
replacement costs, however extravagant, when the insurer breaches the duty to defend.  Rather,
fees must be reasonable.

defense expenses and costs and will schedule a trial to determine whether the attorney fees and

costs were reasonable and whether St. Paul breached its defense obligations.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| PhotoMedex, INC., | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 07-0025 |
| | : | |
| ST. PAUL FIRE & MARINE INS. CO., | : | |
| Defendant. | : | |

# Order

**AND NOW** on this _____ day of February 2008, upon consideration of defendant St. Paul Fire & Marine Insurance Co.'s motion for summary judgment (Docket No. 25), plaintiff PhotoMedex, Inc.'s motion for summary judgment (Docket No. 24), and the responses and replies to both motions, **IT IS HEREBY ORDERED** that:

1.  Defendant's motion for summary judgment is DENIED as to St. Paul's claims that St. Paul does not owe PhotoMedex a duty to indemnify settlement of *Irwin et al. v. PhotoMedex, Inc. et al.*, No. GIC 839208; that PhotoMedex must reimburse St. Paul the $800,000 that St. Paul paid in the settlement of *Irwin*; and that California law controls the fees and costs to be paid in defense of *Irwin*.

2.  Plaintiff's motion for summary judgment is GRANTED as to PhotoMedex's claim that St. Paul is not entitled to recoup from PhotoMedex $800,000 that St. Paul paid to settle *Irwin* pursuant to its duty to indemnify PhotoMedex under insurance policy No. TE06401644; GRANTED as to PhotoMedex's claim that Pennsylvania law controls the attorney fees and costs that St. Paul must reimburse

to PhotoMedex for coverage under insurance policy No. TE06401644 for defense

costs incurred in *Irwin*; and DENIED as to PhotoMedex's claim that St. Paul is

required to reimburse PhotoMedex for all attorney fees and costs totaling

$914,466.70 incurred by PhotoMedex in defense of *Irwin*.  Judgment is

ENTERED in favor of PhotoMedex and against St. Paul to the extent that

Pennsylvania substantive law controls the coverage disputes for insurance policy

No. TE06401644 and that St. Paul is not entitled to reimbursement of its payment

to settle *Irwin*.

3.      A status conference to schedule a trial of the remaining claim is scheduled for

February 20, 2008 at 4:00 p.m. in Chambers.

                                           s/ William H. Yohn Jr.
                                          William H. Yohn Jr., Judge